UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LINDA STORONSKY,

                              Plaintiff,                         DECISION AND ORDER

vs.
                                                                       20-CV-7015 (CJS)

NATIONAL RAILROAD PASSENGER
CORPORATION, a/k/a AMTRAK,

                              Defendant.

_____

## I. INTRODUCTION

On November 6, 2017, Plaintiff Linda Storonsky fell down the escalator that she
was riding up to the train platform at the Louise M. Slaughter Station ("train station")
operated by Defendant National Railroad Passenger Corporation, also known as Amtrak
("Amtrak"), in Rochester, New York. She sustained several injuries during her fall, most
notably a torn rotator cuff in her left shoulder.

In October 2020, Storonsky filed an action in New York state court seeking to hold
Amtrak liable for her November 2017 fall on the basis of negligence, and discrimination
under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act
of 1973 ("RA"), and the New York State Human Rights Law ("NYSHRL"). Not. of Removal
(Ex. A) ("Compl."), Nov. 27, 2020, ECF No. 1-1. In November 2020, Amtrak removed the
case to federal court. Not. of Removal, Nov. 27, 2020, ECF No. 1.

The matter is presently before the Court on Amtrak's motion for summary
judgment, and Storonsky's cross-motion for partial summary judgment as to liability. Def.
Mot. for Summ. J., Mar. 3, 2023, ECF No. 34; Pl. Mot. for Partial Summ. J., Mar 3, 2023,
ECF No. 35. For the reasons stated below, Defendant Amtrak's motion for summary

judgment [ECF No. 34] is granted, and Storonsky's cross-motion for partial summary judgment [ECF No. 35] on her claims of discrimination under the ADA, RA and NYSHRL is denied. The Clerk of Court is directed to close this case.

## II. BACKGROUND[1]

While the parties are not in agreement as to the legal significance of the facts regarding Storonsky's physical condition, it is undisputed that prior to her fall Storonsky had been "diagnosed with lumbar radicular pain, chronic pain syndrome and post laminectomy syndrome of the lumbar region and, specifically, 'post lumbar laminectomy due to resection of ependymoma' following [spinal] surgery where there was damage to the L5 nerve root, resulting in atrophied right calf and mild degree of foot drop." Def. Opp. to Pl. Statement of Facts, ¶ 59, Apr. 10, 2023, ECF No. 39-1. It is also undisputed that Storonsky possessed a cane to help cope with her condition. *Id.* at ¶ 62.

On November 6, 2017, the morning of Storonsky's fall, she arrived at the train station at 7:45 a.m.. Def. Opp. to Pl. Statement of Facts at ¶ 71. The layout of the station is not in question: to access the platform to board her train, a passenger must proceed from the lobby down one level to a hallway leading under the train tracks, and then from the lower level hallway back up one level to the boarding platform. Def. Opp. to Pl. Statement of Facts at ¶ 13–16. Passengers may descend from the lobby to the lower level using stairs, an escalator, or an elevator. *Id.* Similarly, after proceeding through the lower level hallway, passengers may ascend from the lower level to the boarding platform using a different set of stairs, an escalator, or an elevator. *Id.*

---

[1] The following background has been drawn from the parties' respective statements of fact and accompanying evidentiary materials.

2

At the time of Storonsky's arrival at the station, there were three Amtrak customer service representatives ("CSR") on duty: Ricky Krebs, William Brown, and Noretha Martin. Def. Opp. to Pl. Statement of Facts at ¶ 20. Storonsky spoke with CSR Krebs at the ticket counter, requesting a printed copy of her ticket, and help lifting her luggage because she could not lift. *Id.* at ¶ 73–76. *See also* Pl. Mot. for Summ. J. (Ex. L), 30–33, Mar. 3, 2023, ECF No. 35–13 ("Storonsky Tr."). Storonsky, whose printed ticket identified her as "Adult-Disabled," also informed CSR Krebs that she "can't do the stairs or the escalator." *Id.* at ¶ 67, 77.

CSR Krebs responded to Storonsky, telling her she did not need to lift anything because the new station was on one level, and there was no need for her to lift her bags onto the train.[2] *Id.* at ¶ 78; Storonsky Tr. at 31. When asked at deposition whether she specified the type of help she needed, Storonsky testified,

> [Storonsky:] I told him I needed help with my baggage. He told me that everything in the new station was on one level, and there was no need for me to lift my bags.
>
> [Defense Counsel:] And did you discuss anything further with him after he told you that?
>
> [Storonsky:] I told him that I needed – I needed assistance with my bags.
>
> [Defense Counsel:] And how did he respond?
>
> [Storonsky:] You do not need to lift anything in this new station; it's all on one level.
>
> [Defense Counsel:] Did you say anything to him further, after that?

---

[2] CSR Krebs testified at his deposition that he also informed Storonsky that "we have an elevator on both sides of the lobby and going up to the platform," but when Storonsky was asked whether she discussed the elevator with any Amtrak personnel, she responded, "I don't recall." *See* Def. Statement of Fact, ¶ 43, Mar. 3, 2023, ECF No. 34-20; Pl. Resp. to Def. Statement of Fact, ¶ 43, Apr. 10, 2023, ECF No. 40-4; Baum Decl. (Ex. 4), 14, Apr. 10, 2023, ECF No. 39-6.

[Storonsky:] No, I felt that I wasn't getting any helpful response.

Storonsky Tr. at 31–32. Thereafter, CSR Krebs did not render Storonsky any further assistance, did not inform either of the other two CSRs on duty that she needed assistance, and did not tell Storonsky that anyone would be over to help her. Def. Opp. to Pl. Statement of Facts at ¶ 79–85.

Storonsky indicated that after speaking with CSR Krebs she did not speak to either of the other two CSRs on duty, and did not ask them for help. Def. Opp. to Pl. Statement of Facts at ¶ 86. However, CSR Brown believed that at some point, Storonsky had approached him at the ticket counter. *Id.* CSR Brown believed that he informed Storonsky that "someone would be out to help her," and expected that one of the three CSRs on duty would help her. *Id.* at ¶ 87. Yet he did not help her himself, and does not recall asking either of the other CSRs on duty to do so. *Id.* at ¶ 87. CSR Brown also believed that someone at Amtrak had informed Storonsky that there were elevators in the station and that he identified the elevator in the lobby for her. Def. Statement of Fact at ¶ 44. Nevertheless, CSR Brown did not make any effort to direct Storonsky to the elevator on the other side of the lower level hallway by which she could ascend to the boarding platform. Pl. Resp. to Def. Statement of Fact at ¶ 44. Further, neither CSR Brown nor CSR Krebs advised CSR Martin that Storonsky needed assistance, and she did not offer or provide any assistance to Storonsky. Def. Opp. to Pl. Statement of Facts at ¶ 92–97.

There are discrepancies between the parties' respective accounts of what happened in the minutes leading up to Storonsky's fall. Therefore, the Court turns to available video evidence. *Compare Burwell v. Peyton*, 131 F. Supp.3d 268, 293–94 (D.

Vt. 2015), *aff'd sub nom. Burwell v. Moody*, 670 F. App'x 734 (2d Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 & n. 5 (2007)) ("[W]here [there] is a discrepancy between the parties' versions of the facts and a recording of the incident, a court may rely on an unaltered video or audio recording."); *Hulett v. City of Syracuse*, 253 F. Supp.3d 462, 482 (N.D.N.Y. 2017) ("the mere existence of a videotape in the record depicting some or all of the events in dispute will not always be dispositive at the summary judgment stage."). The video evidence from the surveillance cameras at the train station on November 6, 2017 captured an objective view – without audio – of what happened following Storonsky's interaction with the CSRs, and in the minutes leading up to and during Storonsky's fall. *See* Def. Mot. for Summ. J. (Ex. J–L), Mar. 3, 2023, ECF Nos. 34-11 to 34-13. The following paragraphs reflect the Court's observations from these three videos.

The first of the three videos is from the Lobby Surveillance camera at the station, prior to the boarding of the train. Ex. J, ECF No. 34-11 ("Lobby video"). At the start of the video, Storonsky is seated in a bank of chairs near the ticket window, facing what appear to be stairs and an escalator leading to the lower level. Over the course of the first 60 seconds of the video, Storonsky stands, and rolls a piece of her luggage across the lobby to another set of chairs near what appears to be an elevator. She has her cane in hand, but does not use it. After situating her luggage and cane in her new seat by the elevator, Storonsky leaves her cane, returns to her former seat and gets a second piece of rolling luggage and a bag that she carries in her other hand. Finally, Storonsky walks back across the lobby to her new seat, and presses the elevator call button.

CSR Martin then walks across the lobby and removes the sign and barrier from in

5

front of the elevator. Although CSR Martin is standing just a few feet away, Storonsky does not appear to say anything to CSR Martin or ask for any form of help. Instead, Storonsky and a few other passengers enter the elevator with their luggage, and the door closes. Other people in the lobby can be seen at that time gathering in front of the stairs and the escalator, and proceeding down to the lower level.

The second of the three videos is from the lower level hallway surveillance camera. Ex. K, ECF No. 34-12 ("Hallway video"). The viewer can only see one end of the hallway at the top of the screen, where there appears to be an escalator on the left, and an elevator on the right. The wall for the elevator has a large window, and what appears to be the elevator apparatus can be seen through the window. The first 35 seconds of the video shows multiple individuals walking past the camera from the bottom to the top of the screen, then turning left onto either an escalator that is in view or walking to the left of the escalator. No one takes the elevator.

At around the 35-second mark of the Hallway video, Storonsky comes into view walking toward the end of the hallway. She has the handle of one piece of rolling luggage in her right hand with a second piece of luggage stacked on top of it, and is carrying another bag with the strap looped over her left shoulder; her cane is not in view and she does not appear to use it. At the end of the hallway where other individuals are turning left onto the escalator, Storonsky pauses. After looking at the escalator, she looks to her right at what appears to be the elevator. She then turns to look back down the hallway, then to the escalator, then to the elevator again. After a few more seconds of looking back and forth, Storonksy turns left onto the escalator.

6

As Storonsky begins to get on the escalator, an Amtrak CSR appears at the bottom of the screen and remains standing against the wall about mid-way down the hall as he appears to be monitoring passenger traffic. A few seconds later, CSR Martin can be seen walking at a normal pace down the hall toward the stairs and escalator, then racing to stop the elevator after apparently observing Storonsky's fall. While CSR Martin is tending to Storonsky, another passenger can be seen entering the elevator, and the viewer can see through the window to the elevator moving upwards.

At her deposition, Storonsky testified to her mindset prior to her fall:

> I got off the elevator [from the lobby] and I didn't know what floor I was on. I was confused that the [CSR] had told me that everything was on one level. He didn't say a word about going up and down different floors. He told me it was all one level and I could walk straight out onto the track . . . .
>
> So . . . I got off the elevator, and I didn't know where I was. Once again, I saw the people rushing by me, rushing to get up the escalator and up the stairs . . . . I did not see any way, other than the escalator and the stairs to go up, and I was confused. Later on I was told there was that elevator behind me. I didn't recognize it as an elevator. So I . . . went up the escalator . . . .

Storonsky Tr. at 38–39.

The third video is from the surveillance camera of the escalator leading from the lower level up to the train platform. Ex. L, ECF No. 34-13 ("Escalator video"). The view of the Escalator video includes the escalator on the right side of the screen, and a flight of stairs on the left side. Storonsky enters the bottom of the screen at around the 50-second mark, and proceeds onto the escalator without holding the handrails. As the escalator moves up the screen, she works to situate her rolling luggage on the stair below the one she is standing on, and she rides facing sideways rather than facing forward toward the

top of the escalator. After approximately five seconds, as Storonsky continues to attempt to situate her luggage, still facing sideways, she falls toward the bottom of the escalator, bangs her head, and tumbles head over heels before landing on her backside on the escalator. CSR Martin can be seen racing to stop the escalator, and then helps Storonsky move off of the screen.

During her fall, Storonsky tore the rotator cuff for her left shoulder, and ultimately underwent surgery to repair it. Def. Opp. to Pl. Statement of Facts at ¶ 120. As indicated above, she filed a complaint related to this incident in New York state court in October 2020, alleging negligence, discrimination under Title II and Title III of the ADA, discrimination under the Rehabilitation Act of 1973, and discrimination under New York State Human Rights Law. The matter was removed to this Court in November 2020, and the parties later filed the motions for summary judgment presently before the Court.

### III. SUMMARY JUDGMENT STANDARD

When both parties to an action have moved for summary judgment, each party's motion is examined on its own merits. *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citations omitted). With respect to each motion, "the trial court's task at the summary judgment motion stage . . . . is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Hence, summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (internal quotation marks and citation omitted).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, where the moving party has carried its burden to demonstrate entitlement to judgment as a matter of law, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A "party asserting that a fact . . . cannot be genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record . . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)–(2).

## III. AMTRAK'S MOTION FOR SUMMARY JUDGMENT

Amtrak maintains that Storonsky's complaint must be dismissed because she has abandoned her negligence claim, and because she has failed to demonstrate that her discrimination claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and the New York State Human Rights Law ("NYSHRL") have merit. To prevail on her discrimination claims, Storonsky must show that (1) she is a qualified individual with a disability; (2) Amtrak is subject to one of the statutes; and (3) she was denied the opportunity to participate in or benefit from Amtrak's services, programs, or activities, or was otherwise discriminated against by the defendant because of her disability. *Henrietta*

*D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Here, Amtrak concedes that it is subject to the discrimination statutes, but argues that Storonsky has failed to demonstrate that she is "a qualified individual with a disability" under the ADA, and that she has not shown that Amtrak denied her any opportunities, services, programs, or activities by reason of her disability. Def. Mem. of Law, 11–28, Mar. 3, 2023, ECF No. 34-21. Further, Amtrak points out that Storonsky did not oppose Amtrak's motion for summary judgment on her negligence claim, and argues that the claim must therefore be dismissed. Def. Reply, 1, Apr. 24, 2023, ECF No. 42.

A. Spoliation

Before exploring the merits, the Court must address Storonsky's claims of spoliation raised in opposition to Amtrak's summary judgment motion. Storonsky states that she served a preservation demand on Amtrak on January 11, 2018, demanding that all surveillance of the lobby for the date of the accident be preserved. Pl. Mem. in Opp., 11, Apr. 10, 2023, ECF No. 40-3. She further alleges that "Amtrak produced only what they wanted to produce, about three minutes out of roughly forty-five minutes that Ms. Storonsky was at the station waiting in the lobby prior to [her fall]." *Id.* As a result, Storonsky maintains that she is entitled to "an adverse inference" drawn from Amtrak's failure to preserve the full video from the lobby. *Id.*

In response, Amtrak indicates that Storonsky's opposition to Amtrak's motion for summary judgment was the first time she ever challenged the video evidence produced in discovery, that Storonsky's counsel had used the videos at depositions, and that her spoliation argument fails to comply with the requirements of Rule 7 of the Local Rules of

Civil Procedure for the Western District of New York. Reply, 10–11, Apr. 24, 2023, ECF

No. 42. Thus, Amtrak argues that Storonsky is not entitled to any relief with respect to the

video evidence.

> Rule 37(e) of the Federal Rules of Civil Procedure provides that:
>
> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may;
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

However, Rule 7(a)(1) of the Local Rules of Civil Procedure for this Court requires

that a notice of motion be filed and served for all motions which states, in pertinent part,

the relief sought, and the grounds for the request. Further, Local Rule 7(d)(3) provides

that "[n]o motion for discovery and/or production of documents under Fed. R. Civ. P. 37

shall be heard unless accompanied by an affidavit showing that sincere attempts to

resolve the discovery dispute have been made. Such affidavit shall detail the times and

places of the parties' meetings or discussions concerning the discovery dispute and the

names of all parties participating therein, and all related correspondence must be

attached."

In the present case, as Amtrak points out, Storonsky failed to comply with the Local Rules of Civil Procedure. She not only did not file and serve a notice of motion for her request for relief under Rule 37 of the Federal Rules of Civil Procedure, but she also failed to comply with Local Rule 7(d)(3) in that she has not provided detail as to any meetings or discussions concerning the dispute over the video evidence, and she has not demonstrated any sincere attempts to resolve the discovery dispute over the video prior to the motion. Indeed, Amtrak indicated in both its papers and at oral argument that the first it heard of any issues with the video evidence that it produced was in Storonsky's opposition to its motion for summary judgment.

Moreover, even if Storonsky had complied with the Local Rules, she has not demonstrated entitlement to relief under Rule 37, which requires the Court to find either that Amtrak's failure to provide further video evidence was prejudicial to Storonsky, or that Amtrak acted with the intent to deprive Storonsky of the information's use in the litigation. Certainly, Storonsky has not shown that Amtrak acted with the intent to deprive Storonsky of the information. Additionally, given the absence of audio in the surveillance video, it is not clear how Storonsky was prejudiced, particularly given Amtrak's agreement that Storonsky spoke with two Amtrak CSRs despite Storonsky's failure to recall whether she spoke with anyone after the exchange with CSR Krebs detailed above.

Therefore, the Court declines to grant Storonsky any relief under Rule 37 of the Federal Rules of Civil Procedure.

B. Storonsky's Negligence Claim

Next, the Court turns to Amtrak's argument that Storonsky's negligence claim must be dismissed because she did not oppose Amtrak's motion for summary judgment with respect to negligence. Reply at 1. Second Circuit law on this issue is clear:

> In *Jackson v. Federal Express*, we held that when a counseled party moves for summary judgment, "a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." We explained that "[p]leadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them." And insofar as summary judgment "is known as a highly useful method of narrowing the issues for trial," it follows that "preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses." Accordingly, "[g]enerally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others," and "a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." If a district court so holds, it "should . . . include a finding of abandonment of undefended claims or defenses."

*Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (footnotes omitted) (discussing *Jackson v. Federal Express*, 766 F.3d 189, 195–98 (2d Cir. 2014)).

In the present case, Amtrak moved for summary judgment on all claims in Storonsky's complaint, and submitted a well-ordered memorandum in support of its motion, which included two main section headings: one indicating that Storonsky "cannot succeed on her claims of discrimination," and the other that "Amtrak is not liable to Plaintiff for Negligence." Def. Mem. of Law at i, 22–23. Although Storonsky's brief provides a comprehensive response to Amtrak's first section, it does not acknowledge Amtrak's

13

argument that it is not liable for negligence. Similarly, Storonsky's cross-motion for summary judgment addresses only Storonsky's discrimination claims under the ADA, the RA, and NYSHRL. Because Amtrak moved for summary judgment on all claims, and Storonsky opposed the motion with respect to all but the negligence claim, the Court infers from Storonsky's failure to defend or even mention the claim that she has abandoned it. *See, e.g., Kovaco*, 834 F.3d at 144. *See also Bryant v. Steele*, 462 F. Supp.3d 249, 270 (E.D.N.Y. 2020) ("[a] party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim").

C. Legal Principles Guiding the Court's Discrimination Analysis

"[T[he [RA] and Titles II and III of the ADA prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir.), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004) (citations omitted). Because the standards adopted by the ADA and the RA "are nearly identical," courts in this circuit typically consider the merits of the claims together. *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 196 (2d Cir. 2014). Similarly, NYSHRL and ADA claims are analyzed under the same standards.[3] *Ogbolu v. Trustees of Columbia Univ. in City of New York*, No. 21-CV-1697 (JPO), 2022 WL 280934, at *6 (S.D.N.Y. Jan. 31, 2022), *aff'd*, No. 22-419, 2023 WL

___

[3] Storonsky argues that the meaning of "disabled" individual under the NYSHRL is broader than under the federal statutes. However, for reasons discussed below, this distinction is irrelevant to the Court's decision in this case.

2579044 (2d Cir. Mar. 21, 2023) (citing *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)).

Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting 42 U.S.C. § 12131) (internal quotation marks omitted).

With respect to discrimination, the legal analysis relevant to the circumstances of this case is well-settled in the Second Circuit:

> "A public entity discriminates against a[n] . . . individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services." [*Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 197 (2d Cir. 2014)] (quoting *McElwee*, 700 F.3d at 641); *accord Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003).
>
> To ensure "meaningful access" a public entity must make "reasonable accommodations in [its] program or benefit." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also Disabled in Action*, 752 F.3d at 197 (quoting *Henrietta D.*, 331 F.3d at 273). To determine whether a public entity has failed to make reasonable accommodation, we assess "whether a plaintiff with disabilities 'as a practical matter' was denied 'meaningful access' to services, programs or activities to which he or she was 'legally entitled.'" *Wright v. N.Y. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D.*, 331 F.3d at 273). An "accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities." *Id.* at 73.

*Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 61–

15

62 (2d Cir. 2021).

"As a remedial statute, the ADA [and the RA] must be broadly construed to effectuate [their] purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted). However, the scope of the ADA "is not limitless." *Id.* at 69 (citation omitted). For instance, the Second Circuit has made clear that "the ADA does not impose a civility code." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 97 (2d Cir. 2012). Accordingly, the ADA and the RA should not be considered to "regulate individuals' conduct so as to ensure they will never be rude or insensitive to persons with disabilities." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2d Cir. 2008).

D. Qualified Individual with a Disability

Storonsky maintains that she is a qualified individual with a disability under the ADA because she "suffers from an atrophic leg and limp, along with chronic back pain, due to nerve damage secondary to a tumor excision following spinal cord surgery, which substantially limits her major life activities, including but not limited to: her ability to walk, stand, lift, or carry large objects, bend and climb." Compl. at ¶ 55. Amtrak argues that Storonsky has failed to demonstrate that she is a qualified individual with a disability because she has not shown that her atrophic leg, drop foot, and chronic back pain substantially limited a major life activity. Def. Mem. of Law at 14. Amtrak states that the record shows that Storonsky "was able to take care of herself as well as someone else, she could complete her own daily activities without assistance, she could drive

16

independently, walk and stand without assistance, climb stairs or escalators when necessary, travel for vacation and carry her own luggage while traveling, without the use of her self-prescribed cane." Def. Mem. of Law at 17.

The Court notes that the ADA Amendments Act of 2008 ("ADAAA") amended the ADA to provide that the definition of "disability" shall be construed broadly "to the maximum extent permitted by the terms of this chapter" and "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the [ADAAA]." *McElwee*, 700 F.3d at 642 (citing 42 U.S.C. § 12102(4)(A), (B)). *See also* 29 C.F.R. § 1630.2(j)(1)(i) ("[t]he term 'substantially limits' . . . . is not meant to be a demanding standard.").

In the present case, Storonsky has testified that she was diagnosed with a drop foot in 2002, that the drop foot was accompanied by "constant sciatic pain going through from the buttock down through the ball of the foot," and that she has an atrophied leg due to a 2003 surgery to have a tumor removed. Pl. Mot. for Summ. J. (Ex. L), 83–85, Mar. 3, 2023, ECF No. 35-13. She also indicated that she has a limp and cannot stand on the ball of her right foot without falling over, that she has a handicapped parking pass to accommodate her limp, and that at the time of her accident, her atrophied leg would get weaker as the day went on, so she would depend on a cane to walk later in the day. Ex. L. at 88–89, 111.

Moreover, she submitted records from her primary care provider that reflected "poor exercise habits" due to chronic pain from sciatica, as well as chronic tingling in her right leg, insomnia due to pain, and muscle loss in her right leg. Pl. Mot. for Summ. J. (Ex.

17

P), Mar. 3, 2023, ECF No. 35-13. The records from her pain management specialist also indicated that her back pain "seems to be related to activity" and is aggravated by standing and walking, and that she uses her arms to rise from a seated position. Pl. Mot. for Summ. J. (Ex. Q), Mar. 3, 2023, ECF No. 35-13.

Given the broad construction that courts are directed to give to such remedial statutes as the ADA, the Court declines to find at this time that a reasonable juror could not find that Plaintiff was a qualified individual with a disability under the ADA. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

E. Denial of Opportunities, Services, Programs or Activities by Reason of a Disability

Amtrak also maintains that Storonsky has failed to demonstrate the third element of her discrimination claim: that she was denied opportunities, services, programs, or activities by reason of her disability. Specifically, Amtrak argues that Storonsky failed to request the specific assistance she believed she needed, that Amtrak had no notice that Storonsky required assistance, that Amtrak nevertheless provided meaningful and reasonable access to the train platform and trains, and that Amtrak properly trained its employees in ADA compliance. Def. Mem. of Law at 17–28.

Storonsky, however, maintains that the record shows that she requested a reasonable accommodation that would have allowed her to safely reach and board the Amtrak train, that she was not provided with the reasonable accommodation she

requested, and that as a result she sustained injuries that prevented her from utilizing a public accommodation. Pl. Mem. in Opp., 3, Apr. 10, 2023, ECF No. 40-3.

After a thorough review of the parties' papers and the record in this case, the Court agrees with Amtrak that Storonsky has failed to adequately demonstrate that she was denied opportunities, services, programs or activities by reason of her disability.

*Rude or Insensitive Conduct Not an ADA Violation*

To begin with, Storonsky presents an isolated incident in which, at worst, her request for assistance with her luggage was ignored by Amtrak's CSR Krebs and CSR Brown. Arguably, the conduct of CSR Krebs and CSR Brown was rude or insensitive to Storonsky's needs. However, as indicated above, "legislation such as the ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities." *Camarillo*, 518 F.3d at 157–58 (internal citation omitted). Moreover, there is no indication in the record that Krebs' and Brown's conduct was representative of a broader policy or practice among employees at the train station to refuse to assist disabled passengers. *See, e.g., Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 930–31 (7th Cir. 2004) ("it is apparent that [plaintiff] alleges, at worst, individual, isolated instances of employee negligence and not a systemic problem with the policies of the City of Lafayette regarding the structure and operation of the train station . . . Isolated acts of negligence by a city employee do not come within the ambit of discrimination against disabled persons proscribed by the ADA.").

*Little Reason to Believe Storonsky Required Additional Assistance*

In addition, following Storonsky's interactions with CSR Krebs and CSR Brown at

19

the ticket counter, the evidence demonstrates that the three CSRs on duty that day had little reason to believe that the layout of the station did not alleviate her concerns. First, as indicated above, it is undisputed that Amtrak passengers have the option to descend from the lobby to the lower level, and ascend from the lower level to the boarding platform, using either stairs, an escalator, or an elevator. Def. Opp. to Pl. Statement of Fact at ¶ 13–16. Second, it is also undisputed that the boarding platform at the Rochester Amtrak station is level with the train doors, and hence that passengers are able to board the train without either stepping up or down, or lifting their luggage. *Id.* Third, Storonsky does not argue that this station layout fails to comport with the "new station" requirements articulated specifically for Amtrak in Title II of the ADA. *See* 42 U.S.C. § 12162(e)(1). Fourth, Storonsky's account of her exchange with CSR Krebs does not suggest a refusal; instead it suggests he offered an observation – "You do not need to lift anything in this new station; it's all on one level" – that he believed to resolve her concerns. The Court is not aware of any evidence in the record of an outright refusal to help.

Moreover, the video evidence indicates that Storonsky was able to navigate the relevant elements of the train station without help. The Lobby video shows that Storonsky was aware of the lobby elevator, that she was moving about freely with her luggage and without using her cane, and that she did not address CSR Martin with any requests or questions when CSR Martin came over to remove the sign and barrier in front of the elevator shortly before Storonsky got on and descended to the lower level. The Hallway video likewise shows that Storonsky was able to navigate the hallway on the lower level

on her own with her luggage. Thus, to the outside observer, Storonsky was able to navigate both walkways and elevators.

Given Storonsky's failure to ask for additional help after her interactions with CSR Krebs and CSR Brown, and the actions she undertook to get herself to the end of the lower level hallway under the train platform without the aid of a CSR, it was reasonable for the CSRs not to single her out as an individual requiring further assistance. No "interactive process" to determine an appropriate accommodation was possible where Storonsky did not present an obvious need, and ceased to engage Amtrak's CSRs. Indeed, attendants in such situations "are not required to guess a plaintiff's need for reasonable accommodations." *Viera v. City of New York*, No. 15 CIV. 5430 (PGG), 2017 WL 3130332, at *16 (S.D.N.Y. July 21, 2017), *on reconsideration in part*, No. 15 CIV. 5430 (PGG), 2018 WL 4762257 (S.D.N.Y. Sept. 30, 2018) (finding no ADA violation where hospital staff communicated with husband, and then witnessed husband communicating with his hearing-impaired wife and assumed he was translating the staff's message) (internal quotation marks and citation omitted); *Katzowitz v. Long Island R.R.*, 58 F. Supp.2d 34, 39 (E.D.N.Y. 1999) (quoting *Adiutori v. Sky Harbor Intern. Airport*, 880 F. Supp. 696, 703 (D.Ariz. 1995), *affirmed*, 103 F.3d 137 (9th Cir. 1996) (finding nothing in the ADA that provides that entities subject to the ADA "must guess what special services, or the extent of those services, a handicapped passenger requires")).

*Storonsky's State of Mind Not Relevant*

Storonsky's counsel made much at oral argument of Storonsky's confusion as to where she was going, her anxiousness to get to the boarding platform on time, and her

21

obliviousness to the existence of the elevator leading up to the train platform. None of those subjective elements is in serious dispute in this matter. Nevertheless, neither do these elements in any way demonstrate that Storonsky was *denied* the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of" Amtrak's Louise M. Slaughter train station. 42 U.S.C. § 12182(A)(i).

The term "deny," which is otherwise undefined in the ADA, must be "interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 220 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)) (internal quotation marks omitted). As is relevant here, Merriam-Webster's Dictionary defines the term "deny" as "to give a negative answer to," "to refuse to grant." Deny, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/deny (May 31, 2023); *see also* Deny, Oxford English Dictionary Online, https://www.oed.com/ (May 31, 2023) ("Refusal (of what is asked, offered, etc.)."). Here, there is no evidence that Amtrak or its CSRs refused to grant Storonsky access to the train. In fact, Storonsky admits the existence of the elevator at the end of the Hallway to take disabled passengers up to the train platform. Moreover, as discussed above, the evidence shows that CSR Krebs had no reason not to believe that his statement that "the station is on one level" resolved Storonsky's concern, and that the other CSRs at worst failed to notice that Storonsky needed more assistance.

Perhaps more to the point, "as a practical matter" Storonsky had "meaningful access" to the boarding platform. *See Wright*, 831 F.3d at 72. The existence of the elevator to the right of the escalator in the hallway leading to the train platform is not at

issue, and a passenger can be seen using the elevator at the end of the Hallway video after Storonsky's fall. Although Storonsky says that she did not realize it was an elevator, the elevator is visible in the video and there is no evidence in the record to suggest that it was not adequately marked in compliance with the relevant statutes.

Under such circumstances, the Court cannot find that Storonsky was *denied* the opportunity to access the Amtrak train platform for purposes of the ADA.

### *The Facts Do Not Create the Inference of a Lack of Training*

Lastly, there is no evidentiary support for Storonsky's claim that the CSRs' conduct was indicative of a lack of training or poor supervision. In fact, it is undisputed that Amtrak stressed to its CSRs that they were required to take care of ADA passengers, and that if a passenger with a disability requested assistance with their bags, the CSRs were to provide the assistance. Def. Opp. to Pl. Statement of Fact at ¶ 29, 36. It is also undisputed that "Amtrak trained its CSRs that if a passenger with a disability requested assistance, the CSRs would assist them," and that Amtrak's employee manual instructed employees that Amtrak is "committed to ensuring that all passengers, including those with disabilities, are provided with quality customer service and everything necessary to make their trip safe and enjoyable." *Id.* at ¶ 42, 51.

Although dealing with a motion to dismiss rather than a motion for summary judgment, the Second Circuit's decision in *Camarillo v. Carrols Corp.*, 518 F.3d 153 (2d Cir. 2008) is instructive in evaluating the sufficiency of Storonsky's claims in this regard. As another court has summarized it,

> The plaintiff in *Camarillo*, who was also visually impaired, "frequently patronize[d]" restaurants owned by the defendants; "when she . . . asked

for employees to read the menu items, she [was] made fun of, stared at, and forced to wait until other customers behind her in line were served." 518 F.3d at 154. The entire menu was not read to her. *Camarillo*, 518 F.3d at 154. In finding that the plaintiff stated an ADA claim, the Second Circuit focused on the following allegations: that defendants' failure to provide service occurred "on multiple visits"; that employees "'often' responded with annoyance or impatience"; and that these incidents constituted "more than one or two isolated mistakes." *Camarillo*, 518 F.3d at 156-57. Based on these allegations, the Court of Appeals found "a reasonable inference [could] be drawn ... that defendants failed to adopt policies or procedures to effectively train their employees how to deal with disabled individuals." *Camarillo*, 518 F.3d at 157.

*West v. Moe's Franchisor, LLC*, No. 15CV2846, 2015 WL 8484567, at *4 (S.D.N.Y. Dec. 9, 2015).

Here, by contrast, Storonsky's claims stem from a single visit to the Amtrak station during which she did not receive the assistance she had in mind when she made her request, declined to ask again for help and then undertook to transport herself and her luggage to the train platform before falling down the escalator. From that isolated incident, no reasonable inference can be drawn that Amtrak fails to train its employees to provide effective assistance to disabled passengers. *See Stephens v. Shuttle Associates, L.L.C.*, 547 F. Supp.2d 269, 278 (S.D.N.Y. 2008) ("Even assuming the allegations in [plaintiff's] Amended Complaint are true and drawing all reasonable inferences in her favor, based only on one isolated incident [plaintiff] has alleged no set of facts to indicate that . . . Defendants failed to adopt policies or procedures to effectively train their employees how to deal with disabled individuals."). *See also*, *Dicarlo v. Walgreens Boot All., Inc.*, No. 15-CV-2919 (JPO), 2016 WL 482982, at *2 (S.D.N.Y. Feb. 5, 2016) (collecting cases).

Accordingly, the Court finds that Amtrak has demonstrated that there is no genuine dispute over a material fact, and that it is entitled to summary judgment as a matter of law

on Storonsky's claims of discrimination under the Americans with Disabilities Act, the Rehabilitation Act, and NYSHRL. Those claims, therefore, are dismissed with prejudice.

## IV. STORONSKY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In her motion for partial summary judgment, Storonsky seeks judgment against Amtrak on the issue of liability on her discrimination claims under the ADA, the Rehabilitation Act, and the New York State Human Rights Law. Pl. Mem. of Law, 15, Mar. 3, 2023, ECF No. 35-21. Specifically, Storonsky maintains (1) that she is a qualified individual with a disability under the law, (2) that Amtrak is an entity subject to the law, and (3) that she was denied the opportunity to participate in or benefit from Amtrak's services, programs, or activities by reason of her disability when Amtrak employees "refus[ed] to provide her assistance in reaching the platform with her luggage after she requested assistance from not one, but two Amtrak employees." Pl. Mem. of Law at 10.

As discussed at length above, the Court has carefully reviewed the papers and found that Storonsky has failed to demonstrate that she was denied the opportunity to participate in Amtrak's services by reason of her disability. Accordingly, Storonksy's motion for partial summary judgment [ECF No. 35] must be denied.

## V. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant Amtrak's motion for summary judgment [ECF No. 34] is granted with respect to Plaintiff Linda Storonsky's negligence claim, as well as her discrimination claims under the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the New York State Human Rights Law, and the complaint is dismissed; and it

is further

ORDERED that Storonsky's motion for partial summary judgment on the issue of liability for her discrimination claims [ECF No. 35] is denied.

The Clerk of Court is directed to close this case. SO ORDERED.

Dated:     June 8, 2023
           Rochester, New York

                                        ENTER:

                                        _____
                                        CHARLES J. SIRAGUSA
                                        United States District Judge